VERNA MILLER, RESPONDENT, v. ROSEBUD BANK, A DELINQUENT CORPORATION IN CHARGE OF R. W. HOLT, STATE FINANCE COMMISSIONER OF MISSOURI, APPELLANT.—116 S. W. (2d) 267.

St. Louis Court of Appeals. Opinion filed May 3, 1938.

Rehearing Overruled May 18, 1938.

*Booth & Anding* and *Joseph T. Tate* for respondent.

*C. L. Shotwell* for appellants.

McCULLEN, J.—This is a suit in equity brought by respondent, plaintiff below, to establish a claim for preference against the Rosebud Bank, an insolvent banking corporation which was in charge of O. H. Moberly, State Finance Commissioner of Missouri, for purposes of liquidation. After this cause was argued and submitted in this court, R. W. Holt, Commissioner of Finance of Missouri, was granted leave as such Commissioner to enter his appearance in place of O. H. Moberly, former Finance Commissioner of Missouri, and the caption of the cause was amended by inserting said Commissioner's name in place of said O. H. Moberly.

The amended petition of plaintiff on which the case was tried alleged that, on June 1, 1932, he had on deposit in said bank the sum of $2343, evidenced by a certificate of deposit bearing four per cent interest, which was due and payable to him on that date; that, shortly after June 1, 1932, he presented said certificate for payment at said bank while it was open and doing business, but that payment was refused, although said bank at that time had sufficient assets and funds to pay said deposit.

The amended petition further alleged that plaintiff, on July 2, 1932, had on deposit in said bank the sum of $2,944.84, evidenced by a certificate of deposit bearing four per cent interest, which was due and payable to him on that date; that on July 2, 1932, he presented said certificate of deposit to said bank while the bank was open and doing business, but that payment was refused although said bank at that time had sufficient assets and funds to pay said deposit.

Plaintiff further alleged that on December 19, 1932, said bank was closed and all of its business and assets were placed in the hands of the Commissioner of Finance for the reason that said bank was insolvent; that the said bank and the Commissioner of Finance now have, and at the time the bank was closed had, on hand sufficient money and assets to pay the claim of plaintiff; that a claim was duly filed with the Special Deputy Commissioner in charge of the bank, and was allowed as a common claim and certified to the circuit court for adjudication as to priority of payment. Plaintiff prayed judgment for $5,391.86, and that said amount be decreed a trust fund in the hands of the Commissioner of Finance and be paid as a preferred claim.

The answer of respondents, hereinafter referred to as defendants, was a general denial. The suit was originally filed in the Circuit Court of Gasconade County, but, on plaintiff's application for change of venue, was transferred to the St. Louis County Circuit Court where it was tried. After a trial, the court rendered judgment in favor of plaintiff in the sum of $5,121.87, which sum was declared to be a trust fund in the hands of the Commissioner of Finance and was allowed and ordered paid as a preferred claim. After an unavailing motion for a new trial, defendants bring the case to this court by appeal.

The evidence shows that plaintiff was the owner and holder of a six months certificate of deposit issued by the defendant Rosebud Bank in the sum of $2,343.57, which became due on June 1, 1932. It was introduced in evidence as plaintiff's Exhibit A. Plaintiff also owned and held another six months certificate of deposit issued by said Bank in the sum of Two Thousand, Nine Hundred Forty-four Dollars and Eighty-four Cents ($2,944.84), which became due on July 2, 1932. This second certificate of deposit was introduced in evidence as plaintiff's Exhibit C. Plaintiff went to the defendant bank about a month before the certificates of deposit were due to see if he could get his money. He was told he could not get the money until the certificates were due.

Plaintiff was a street car conductor and lived in the City of St. Louis; he was about forty-five years old, and had only an eighth grade education. Being unable to get his money at that time, he left one of the certificates of deposit (plaintiff's Exhibit A), being the first one that would fall due, with his mother, Mrs. Emma Miller, who lived at Rosebud, Missouri. She was sixty-three years of age, and testified that she had gone only as far as the third reader in school; that she had never had any business training of any kind; had been married for forty-seven years, and had done nothing outside of being a housewife. Shortly before June 1, 1932, the date on which Exhibit A was due, plaintiff wrote to his mother to take that certificate of deposit to the Bank and get his money. About June 6, 1932, plaintiff's mother presented said certificate of deposit at the bank to H. F. Brinkman, the bank's cashier, while the bank was open and doing business, and demanded payment. Prior to that time the bank had been placed under restrictions by its board of directors, and the cashier had been directed by said board to permit the withdrawal in cash on account of certificates of deposit and other deposits at the rate of $10 per week only. When plaintiff's mother presented said certificate of deposit and demanded payment, the cashier told her to indorse it, which she did by writing on the back of it the name of her son, followed by her own name. The cashier then told plaintiff's mother that the board of directors of the bank had placed a restriction on withdrawals and that money could only be withdrawn at the rate of $10.00 per week. The cashier thereupon wrote out another certificate of deposit (introduced in evidence as plaintiff's Exhibit B), which was made due twelve months from date with interest at four per cent per annum, and was for the sum of $2,343.57, being the same amount as plaintiff's Exhibit A. The interest than due was deposited in plaintiff's checking account, to be withdrawn under the $10 per week restrictive arrangement for the bank heretofore mentioned.

On July 2, 1932, plaintiff went to Rosebud, got from his mother plaintiff's Exhibit B, which, according to the mother's testimony,

she was holding merely as a receipt for the money due on plaintiff's Exhibit A which had not been paid. Plaintiff then personally went to the bank while it was open and doing business, and, after indorsing plaintiff's Exhibit B as well as the certificate of deposit for $2,944.84 due on July 2, 1932, (which was introduced as plaintiff's Exhibit C) presented both certificates to the cashier of the bank and demanded payment thereon. The cashier refused to make payment, and stated to plaintiff that he could only pay out money at the rate of $10 per week under the restrictions ordered by the board of directors of the bank. The cashier further told plaintiff that, in order to draw out money at the rate of $10 per week, it would be necessary to place the same in plaintiff's checking account and then plaintiff could draw a check on it for $10 each week. Plaintiff told the cashier that he lived in St. Louis, and that it wouldn't be convenient for him to draw money out at the rate of $10 per week; that if the bank was going to close up, it wouldn't be worth his while to attempt to draw the money out in that way. The evidence shows that, after some discussion between plaintiff and the cashier of the bank, the latter made out a new certificate of deposit for $2950, (which was introduced in evidence as plaintiff's Exhibit D) making it due twelve months after date, with interest at four per cent per annum. Plaintiff testified that he finally took this certificate of deposit only as a receipt "because that was the best he could do." In this connection, plaintiff further testified that nothing was said to him about making the new certificates for twelve months instead of six months, as the original certificates were. It is undisputed that the interest that became due on the certificates of deposit had been placed to the credit of plaintiff's checking account in the bank, and that he had withdrawn it all at the rate of $10 per week.

It was admitted by stipulation of the parties that the Commissioner of Finance, through his deputy in charge of the defendant bank, had, by order of the Circuit Court of Gasconade County, Missouri, paid a dividend of five per cent., amounting to $269.99, to plaintiff by check dated November 1, 1935, and that the defendant bank is entitled to a credit for said amount on plaintiff's claim. The stipulation, however, further provided that nothing therein should be construed as a waiver on the part of the plaintiff of his right to have his claim presented and allowed as a preferred claim against the defendant bank in the event the court found from the evidence in the cause that plaintiff is entitled to such preference.

H. F. Brinkman, the cashier of the defendant bank, gave testimony which in the main was to the same effect as the testimony of plaintiff and plaintiff's mother in relation to their coming to the bank with the certificates; presenting them for payment; and being told by him that they could not be paid because of the restrictions put upon payments by the bank by its board of directors.

Plaintiff introduced in evidence plaintiff's Exhibit L, which is the official proof of claim made by him against the Rosebud Bank. It was subscribed and sworn to by plaintiff on May 25, 1933, before H. F. Brinkman as notary public. It showed the claim was filed with the Commissioner of Finance on May 25, 1933, and approved by said officer on November 3, 1933. The certificates of deposit set forth in Exhibit L are plaintiff's Exhibits B and D, which, with interest thereon make a total of $5,399.86. This amount also included one cent as a balance due on open account subject to check, as shown by said Exhibit.

Defendants contend that plaintiff having filed his claim before the Commissioner of Finance against the defendant bank based upon two certificates of deposit (Exhibits B and D), cannot be permitted to recover in the circuit court on a claim for two other and entirely different certificates, namely A and C; that, by accepting renewal certificates of deposit, plaintiff waived his right to demand payment of the original certificates, and that the demand made for payment of the original certificates was also thereby waived. Defendants further contend that, by having his said renewal certificates of deposit with interest thereon allowed against the bank as a common claim, and by accepting a dividend on the principal and the interest on such claims, plaintiff is estopped from asserting that the certificates were renewed without his consent.

It appears from the evidence that the claim filed before the Commissioner of Finance was made upon a form prepared and furnished by the bank, and that it was sworn to by plaintiff before the cashier of the bank acting as a notary public. The testimony of the cashier of the bank is, in our opinion, not sufficient to warrant the conclusion that the certificates of deposit (plaintiff's Exhibits B and D) were accepted by plaintiff as renewal certificates, as against the positive testimony of plaintiff and his mother that they took them merely as receipts to show that the bank still had plaintiff's money. Throughout his testimony, the cashier, when asked to relate the conversations that took place between him and Mrs. Miller (plaintiff's mother) on the one occasion, and between him and plaintiff on the other occasion when plaintiff was demanding his money, repeatedly answered: "I don't know;" or "I don't remember;" and further, "I do not remember the conversation;" also "I don't remember the particulars of it;" and further, "the exact words I cannot say, but it was a general talk." When the cashier was asked whether he remembered plaintiff coming to the bank with plaintiff's Exhibit C and asking for cash, he answered: "Well nothing to be definite about that, I suppose he has, but there were so many came in at that time and everything was in such a turmoil I cannot recall that I saw this particular person, but I take it for granted that he was there." Referring to the visit made by plaintiff to the bank on July 2, 1932, when plain-

tiff demanded his money on plaintiff's Exhibit C, as well as the money on plaintiff's Exhibit A, which was then represented by plaintiff's Exhibit B, the cashier testified:

"Q. You do not remember what was said on this occasion? A. No.

"Q. And you don't remember what was said while he was there? A. No, sir.

"Q. Did you say anything, either to Mrs. Miller or to Mr. Miller, that you can remember, when they were in the bank, as to why you changed those deposits from six months' maturity to twelve months' maturity; did you give either one of them any reason for that? A. I don't remember. Not that I know of."

The testimony of the cashier throughout cannot be said to be in conflict with the testimony of plaintiff and his mother with respect to the conversations that took place between them on the occasions when demand was being made for payment of the certificates of deposit. When asked by counsel for defendants if he remembered what plaintiff said to him on July 2, 1932, when plaintiff was demanding his money, the cashier said: "I do not remember the conversation." On cross-examination the cashier testified:

"Q. These conversations you had with Mr. Miller and Mrs. Miller, you say you cannot remember exactly what was said on those occasions? A. Yes, and neither could you.

"Q. And you are basing your answers very largely on what you thought you had done under the circumstances, is that right? A. No, sir; the general run, what I told the rest of them.

"Q. Your general custom? A. Yes, sir.

"Q. In this particular instance you have no recollection of what was said? A. The exact words, no. The exact conversation, no, and nobody else would have four years afterwards."

It is very evident from the entire testimony of the cashier that he was carefully trying to testify only to facts that he could remember clearly, for he said at one place in his testimony:

"I took an oath to tell the truth and I cannot say the words she said, but the general run of conversation with other parties, and I told them the same thing, and I always referred to the restriction."

The cashier of the bank was the only witness who testified for defendants. As against such testimony of the bank's cashier we find the positive, clear and unequivocal testimony of plaintiff and his mother. On cross-examination plaintiff was asked by defendants' counsel if he said anything when the banker told him he would write out a new certificate, and answered: "I told him if he could not do nothing different I guessed he would have to do it. I wanted something to show for my money." Plaintiff further testified that the reason he did not ask the cashier to give back to him the certificate of deposit which the cashier had taken from plaintiff's mother was

"because I didn't think it would do me any good if I got it. . . . I just asked for the money, and I didn't think about asking for them back, because I didn't think a note was getting my money." At this point the witness was asked:

"Q. You didn't tell him you did not want it renewed, did you?" and answered:

"A. Yes, I told him I didn't want it renewed and I wanted money and money was what I was after."

In the face of such evidence, it cannot be said that plaintiff consented to the new certificates of deposit as renewals of the old ones, with any intention on his part to waive his right to payment of the money that was unquestionably due him from the bank at that time. The so-called renewal certificates were practically forced upon plaintiff under the circumstances in evidence. Plaintiff and his mother each did the only thing that could be done when they took with them, as evidence of the bank's obligations to plaintiff, the Exhibits B and D written out by the cashier after he had flatly refused payment on the Exhibits A and C.

Certainly plaintiff should not be penalized by the loss of his right to a preference on his claim because, in his inexperience, he was not more forceful in his dealings with the bank's cashier. It is clear from the evidence that neither plaintiff nor his mother was capable of coping with the financially experienced cashier on such a question in such a situation. There can be no doubt, however, that the only thing plaintiff was interested in was getting his money when it was due. He gave no indication of any intention on his part to waive his right thereto, and, in taking with him the certificates B and D, he did only what prudence dictated under the circumstances, by preserving tangible evidence of the bank's obligations to him, or, as he said, "something to show for my money." From their viewpoint at the time; the bank's officials undoubtedly acted for what they conceived to be the best interests of all concerned. Nevertheless, their refusal to pay plaintiff when he demanded his money was unauthorized.

Waiver is the voluntary and intentional relinquishment or abandonment of a known existing legal right. [67 C. J., section 1, p. 289.] It has been repeatedly held that the doctrine of waiver is not applicable unless the waiver has been made with full knowledge of the rights claimed to have been waived; nor can there be a waiver without facts plainly appearing which show not only that the right is known to the party against whom the waiver is sought to be enforced, but also that it was his intention to waive such right. [Schwab v. American Yeoman, 305 Mo. 148, 264 S. W. 690; Springfield Security Co. v. Boren (Mo. App.), 275 S. W. 566; Howe Scale Co. v. Geller, Ward & Hasner Hdw. Co. (Mo. App.), 285 S. W. 141.]

We think it is unnecessary to discuss further the refinements of waiver and estoppel under such evidence as appears in this record.

We find nothing in the evidence that would justify a holding that plaintiff waived his right to a preference in relation to the funds due him. Furthermore, we find no action or conduct on plaintiff's part and nothing in the record whatsoever to warrant a holding that plaintiff is estopped to assert his right to a preference.

The refusal of the bank to pay plaintiff's certificates of deposit when they were due, at a time when it is conceded that the bank was open and doing business and there were sufficient funds to pay them, was wholly without any authority of law despite the orders of the board of directors, and constituted the bank a trustee for the sums mentioned, thereby entitling plaintiff to a preference for said amounts upon the bank's insolvency and subsequent liquidation. [Bank of Poplar Bluff v. Millspaugh, 313 Mo. 412, 281 S. W. 733; Hiatt v. Miller Bank, 224 Mo. App. 1040, 34 S. W. (2d) 532; Johnson v. Farmers Bank of Clarksdale, 223 Mo. App. 513, 11 S. W. (2d) 1090; Koehler v. Joplin State Bank (Mo. App.), 68 S. W. (2d) 728; Claxton v. Cantley (Mo. App.), 297 S. W. 975; In re Farmers & Merchants Bank of Center (Mo. App.), 83 S. W. (2d) 198; Laclede Trust Co. v. Rodenberg (Mo. App.), 93 S. W. (2d) 55.]

The contention of defendants that plaintiff waived his right to a preference by having accepted a five per cent dividend, which was paid to all depositors of the bank, cannot be sustained under the evidence in this record. Said dividend was accepted by plaintiff a long time after the bank was closed and in the hands of the Commissioner of Finance, and after plaintiff had filed his suit for a preference. There is no evidence to show that the dividend mentioned was paid by defendants or accepted by plaintiff as a payment upon any particular certificate of deposit. It was merely a partial payment on plaintiff's claims against the bank; and, in accordance with the stipulation filed by the parties, to which we have heretofore referred, the bank was entitled to be given credit for such payments as against plaintiff's claims. It will be recalled that said stipulation specifically provided that it was not to be construed as a waiver of plaintiff's right to have his claim presented and allowed as a preferred claim.

We have considered all the points made by defendants, and are of the opinion that the trial judge reached the right conclusion. The judgment is, therefore, affirmed.

*Hostetter, P. J.,* and *Becker, J.,* concur.